UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

STEVEN R. GASS,

            Plaintiff,

            v.                                   CAUSE NO.: 1:19-CV-404-TLS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

            Defendant.

**OPINION AND ORDER**

The Plaintiff Steven R. Gass seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits and supplemental security income. For the reasons set forth below, the Court finds that reversal and remand for further proceedings is required.

**PROCEDURAL BACKGROUND**

On December 24, 2012, the Plaintiff filed an application for disability insurance benefits, alleging disability beginning on September 1, 2012. AR 55, ECF No. 9. After the Appeals Council denied review of the administrative law judge's (ALJ) unfavorable decision, the Plaintiff filed a complaint in federal court, and the court remanded the case for further proceedings. *Id.* at 2–5, 14–26, 581–601. On January 10, 2018, the Appeals Council remanded the case to an ALJ, consolidating the remand with the Plaintiff's new applications for disability insurance benefits and supplemental security income filed on June 8, 2016. *Id.* at 610.

Pursuant to the remand order, a different ALJ held a hearing and issued a partially favorable decision on August 16, 2018. AR 396–424. The ALJ found the Plaintiff disabled for supplemental security income purposes as of August 1, 2018. However, because the Plaintiff's

date last insured for purposes of disability insurance benefits was December 31, 2016, the ALJ

found the Plaintiff not entitled to disability insurance benefits. On July 23, 2019, the Appeals

Council denied the Plaintiff's request for review, AR 384–86, thereby rendering the ALJ's

decision the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir.

2019). On September 23, 2019, the Plaintiff filed his Complaint [ECF No. 1], seeking judicial

review under 42 U.S.C. § 405(g). The Plaintiff filed an opening brief [ECF No. 16], the

Commissioner filed a response [ECF No. 21], and the Plaintiff filed a reply [ECF No. 22].

### THE ALJ'S DECISION

For purposes of disability insurance benefits, a claimant is "disabled" if he is unable "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§ 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).[1] To be found disabled, a claimant must have a

severe physical or mental impairment that prevents him from doing not only his previous work,

but also any other kind of gainful employment that exists in the national economy, considering

his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

An ALJ conducts a five-step inquiry to determine whether a claimant is disabled. 20

C.F.R. § 404.1520. The first step is to determine whether the claimant is no longer engaged in

substantial gainful activity. *Id.* § 404.1520(a)(4)(i), (b). In this case, the ALJ found that the

Plaintiff had not engaged in substantial gainful activity since his alleged onset date of September

1, 2012. AR 404. At step two, the ALJ determines whether the claimant has a "severe

---

[1] For convenience, the Court cites to the disability insurance benefits statutes and regulations, which are largely identical to those applicable to supplemental security income relevant to this case. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c). Here, the ALJ found that the Plaintiff has the

severe impairments of peripheral neuropathy; degenerative disc disease of the lumbar spine; right

shoulder supra-spinatous, infra-spinous, and sub-scapularis tears; right elbow trauma residual

extension deficits; diabetes mellitus; and obesity. AR 404. Step three requires the ALJ to

consider whether the claimant's impairment(s) "meets or equals one of [the] listings in appendix

1 to subpart P of part 404 of this chapter." 20 C.F.R. § 404.1520(a)(4)(iii), (d). The ALJ found

that the Plaintiff does not have an impairment or combination of impairments that meets or

medically equals a listing. AR 407–08.

When a claimant's impairment(s) does not meet or equal a listing, the ALJ determines the

claimant's "residual functional capacity" (RFC), which "is an administrative assessment of what

work-related activities an individual can perform despite [the individual's] limitations." *Dixon v.*

*Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520(e). In this case,

the ALJ assessed the following RFC:

> After careful consideration of the entire record, I find that since September 1, 2012, the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). He can stand and/or walk for two hours during an eight-hour workday and occasionally use his right foot to operate foot controls. As to postural changes, he can occasionally climb ramps and stairs, balance, stoop, crouch, and crawl, but cannot climb ladders, ropes, or scaffolds. With respect to his workplace environment, the claimant must avoid unprotected heights and slippery surfaces.

AR 408.

The ALJ then moves to step four and determines whether the claimant can do his past

relevant work in light of the RFC. 20 C.F.R. § 404.1520(a)(4)(iv), (f). Here, the ALJ determined

that the Plaintiff cannot perform any of his past relevant work in light of the RFC. *See* AR 421.

At step five, the ALJ considers whether the claimant can "make an adjustment to other work"

given the RFC and the claimant's age, education, and work experience. 20 C.F.R

§ 404.1520(a)(4)(v), (g). The ALJ found that, prior to August 1, 2018 (the date the Plaintiff's age

category changed), there were jobs that existed in significant numbers in the national economy

that the Plaintiff could have performed of document addresser, final assembler, and table worker.

AR 422–23. However, beginning August 1, 2018, there were no such jobs. *Id.* at 423. As a result,

the ALJ found that the Plaintiff was not under a disability at any time through December 31,

2016, the date last insured, but became disabled on August 1, 2018. *Id.* The claimant bears the

burden of proving steps one through four, whereas the burden at step five is on the ALJ.

*Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1512.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the agency's final decision. 42

U.S.C. § 405(g). On review, a court considers whether the ALJ applied the correct legal standard

and the decision is supported by substantial evidence. *See Summers v. Berryhill*, 864 F.3d 523,

526 (7th Cir. 2017); 42 U.S.C. § 405(g). A court will affirm the Commissioner's findings of fact

and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*,

539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1154 (2019) (citations omitted). Even if "reasonable minds could differ" about the

disability status of the claimant, the court must affirm the Commissioner's decision as long as it

is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (quoting *Schmidt v.*

*Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

The court considers the entire administrative record but does not "reweigh evidence,

resolve conflicts, decide questions of credibility, or substitute [the court's] own judgment for that

of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Lopez ex*

*rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Nevertheless, the court conducts a

"critical review of the evidence," and the decision cannot stand if it lacks evidentiary support or

an adequate discussion of the issues. *Lopez*, 336 F.3d at 539 (citations omitted); *see also Moore*

*v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) ("A decision that lacks adequate discussion of the

issues will be remanded."). The ALJ is not required to address every piece of evidence or

testimony presented, but the ALJ "has a basic obligation to develop a full and fair record and

must build an accurate and logical bridge between the evidence and the result to afford the

claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758

F.3d 834, 837 (7th Cir. 2014) (internal citations omitted).

## ANALYSIS

The Plaintiff seeks reversal of the ALJ's decision, arguing that the ALJ failed to properly

address his hand limitations and need for a cane in formulating the RFC, failed to meet the

Commissioner's burden at step five, erred in evaluating the medical opinion evidence, and

erroneously evaluated his subjective symptoms. For the following reasons, remand for further

proceedings is required.

**A.      Residual Functional Capacity—Hand Limitations and the Need for a Cane**

The Residual Functional Capacity ("RFC") is a measure of what an individual can do

despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R.

§ 404.1545(a)(1). The "RFC is an assessment of an individual's ability to do sustained work-

related physical and mental activities in a work setting on a regular and continuing basis. A

'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work

schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The relevant evidence of the

individual's ability to do work-related activities includes medical history; medical signs and

laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded

observations; medical source statements; the effects of symptoms, including pain, that are

reasonably attributed to a medically determinable impairment; evidence from attempts to work;

need for a structured living environment; and work evaluations, if available. *Id*. at *5. The

determination of a claimant's RFC is a legal decision rather than a medical one. *Thomas v.*

*Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)).

*1.      Hand Limitations*

The Plaintiff argues that the ALJ erred by failing to include any hand limitations in the

RFC. The Plaintiff cites his symptoms of carpal tunnel syndrome dating back to February 2013

and the corresponding February 2013 EMG findings, the EMG study in 2017 that revealed

diagnoses including right and left carpal tunnel syndrome, the findings of Ms. Bennett who

conducted a functional capacity evaluation in May 2016, the findings of consultative examiner

Dr. Greer in June 2016, and the records and opinions of his treating physician Dr. Hagan. The

Commissioner does not address the Plaintiff's arguments, discuss the evidence, or explain how

the ALJ's decision is supported by substantial evidence. The Court finds that the ALJ failed to

create a logical bridge between the evidence demonstrating limitations in the Plaintiff's use of

his hands and the RFC for sedentary work with no hand limitations.

In February 2013, an EMG of the Plaintiff's right upper extremity showed moderate

carpal tunnel syndrome. AR 239, 260. At that time, Dr. Snyder noted that the Plaintiff "has

persistent symptoms in the carpal tunnel" but that it did not bother him all that much except that

"[h]e does have times where he drops things at work." *Id.* at 260. All treatment options were

discussed, both operative and nonoperative, and a night splint, which the Plaintiff was to

purchase over the counter, was the chosen treatment. *Id*. at 261. The ALJ appears to discredit the

Plaintiff by noting that he declined injections for his carpal tunnel syndrome. *See id.* at 415.

Although the ALJ was aware that the Plaintiff did not have insurance at that time, the ALJ does

not appear to consider the lack of insurance in weighing the Plaintiff's choice. *See id.* at 408.

A few months later, in an April 2013 consultative examination with Dr. Onamusi, the

Plaintiff reported pain with turning a wrench, pain and stiffness in the middle fingers with

associated swelling and joint stiffness involving the right elbow, weakness and numbness in both

hands, and dropping objects from both hands. *Id.* at 282. In contrast, under "Functional

Capabilities," Dr. Onamusi wrote that the Plaintiff reported "[h]e has no trouble using the hands

for gross or fine motor tasks." *Id*. at 283. In his decision, the ALJ notes only the latter report,

ignoring the earlier, more detailed report that is favorable to the Plaintiff. *See id.* at 415. The ALJ

correctly notes normal findings by Dr. Onamusi that the Plaintiff was able to reach forward,

push, or pull with the upper extremities and use his hands for fine coordination and manipulative

tasks. *Id.* at 415 (citing *id.* at 284). However, the ALJ notes Dr. Onamusi's finding of decreased

grip strength in the right hand but then found that the Plaintiff could "still" "grip 35 pounds with

it." *Id.* at 415 (citing *id.* at 284). The ALJ offers no explanation for why a grip strength of 35

pounds is inconsistent with the Plaintiff's reports of pain and weakness. In *Hermann v. Colvin*,

the Seventh Circuit explained that trouble with "'handling' . . . is consistent with reduced grip

strength (indeed, gripping is a form of handling) and is an essential manipulative activity in a

great many jobs." 772 F.3d 1110, 1112 (7th Cir. 2014). Based on the study cited in *Hermann*

containing normative grip and pinch strength data for adults, the mean grip strength for men age

40–45 for the right hand is 116.8 pounds. *See Hermann*, 772 F.3d at 1112 (citing Virgil

Mathiowetz *et al.*, *Grip and Pinch Strength: Normative Data for Adults*, 66 Archives of Physical

Medicine and Rehabilitation 69, 71 (1985) https://www.researchgate.net/publication/19190602_

Grip_and_Pinch_Strength_Normative_data_for_adults). Thus, the Plaintiff's right hand grip strength on examination by Dr. Onamusi was significantly below normal, which appears consistent with the Plaintiff's complaints and the EMG. *See Thompson v. Saul*, No. 2:20-CV-114, 2021 WL 2660223, at *6 (N.D. Ind. June 29, 2021) (citing *Hermann*, 772 F.3d at 1112).

The ALJ found Dr. Onamusi's opinion consistent with other examining or treating sources but failed to specifically address many of their findings that support the Plaintiff's complaints regarding his hand limitations over time. First, in a July 2014 medical source statement, Dr. Hagan limited the Plaintiff's use of his hands based on a diagnosis of arthritis, which the ALJ does not note; Dr. Hagan found that the Plaintiff can never reach overhead, finger, or push/pull and can occasionally handle and feel. AR 315. At a July 28, 2014 examination, the Plaintiff reported muscular weakness and pain in his right hand and both wrists and, on examination, Dr. Hagan found positive carpal tunnel signs on the right. *Id.* at 381.

The ALJ discusses and emphasizes the July 2015 examination findings of Ms. Lanning, a nurse working with pain specialist Dr. Posner, that the Plaintiff had normal motor functioning in his radial, ulnar, and median nerves; grossly normal upper extremity sensory functioning; normal reflexes of is biceps, triceps, and brachio-radialis; and upper extremities that were non-tender with full range of motion and without crepitus. *Id.* at 416 (citing *id.* at 1135). The ALJ does not discuss how these findings may be inconsistent with the EMG findings in both 2013 and 2017 and the related diagnoses of carpal tunnel syndrome. In addition, there do not appear to be any specific examination findings regarding fingering or handling.

In May 2016, Carol Bennett, PT, OCS, conducted a functional capacity evaluation at the request of Dr. Hagan. *Id.* at 988–97. Ms. Bennett noted that the Plaintiff cooperated fully and did not refuse any tests, which the ALJ does not note. *Id.* at 989. Ms. Bennett found that the Plaintiff

could perform fine motor tasks on a constant basis but "at a slow speed" and that he could do simple grasping on a constant basis but "no forceful grasping." *Id.* at 989, 993. The ALJ recites these findings but offers no explanation of whether they are consistent with handling and fingering requirements of sedentary work and the jobs identified by the vocational expert at step five or how they are inconsistent with the Plaintiff's subjective complaints. In addition, Ms. Bennett noted that the Plaintiff "was able to complete all the grasp tests but his values were low." *Id.* at 993. And she wrote: "His decreased strength and compromised sensation in his hands inhibited his ability to perform forceful grasp and fine motor activities." *Id.* at 989.

In August 2016, the Plaintiff reported to consultative examiner Dr. Carolyn Greer that he cannot pick up a coin, can button but does so much slower than normal, used a pair of pliers to zip, cannot tie shoes, and can write with a pen or pencil for only short intervals due to numbness in his hands and fingers. *Id.* at 416 (citing *id.* at 1046). On physical examination, Dr. Greer found reduced range of motion in the wrists but found normal grip and upper extremity strength and normal reflexes in his upper extremities. *Id.* at 1048–50. The ALJ does not discuss the inconsistency between Dr. Greer's examination findings on grip strength and those of Dr. Onamusi, Ms. Bennett, and Dr. Hagan as well the Plaintiff's subjective complaints. *Id.* at 416. In addition, the ALJ did not note Dr. Greer's finding of arthritis in the hands. *Id.* at 1051.

In April 2017, at a follow up on his peripheral neuropathy, Dr. Hagan noted on exam that the Plaintiff continued to have decreased sensitivity in both upper and lower extremities and that he reported "that it's becoming difficult for him to pick up small objects with his fingers." *Id.* at 1152. The Plaintiff reported that "he has to use the back of his hand to test the temperature of water, because he can't feel if water is hot or cold." *Id.* Dr. Hagan noted that the Plaintiff had been evaluated by EMG three years earlier and was diagnosed with multifactorial peripheral

neuropathy and that the Plaintiff thinks that his symptoms are getting worse despite improvement

of his diabetes. *Id.* at 1153. Dr. Hagan ordered the EMG that was performed the next month.

The impression of the May 2017 EMG included "abnormal" and "[s]everal lesions

identified." *Id.* at 1301. There was a finding of "severe generalized peripheral polyneuropathy

affecting sensory fibers greater than motor fibers and with both demyelinative and axonal

features" and of "localized compressive neuropathy of the median nerve at the carpal tunnel

bilaterally resulting in some chronic distal denervation." *Id.* Dr. Curfman gave a diagnosis of

right and left carpal tunnel syndrome, peripheral neuropathy, and diabetic neuropathy. *Id.* at

1302. Attempting to minimize the diagnosis, the ALJ reasons that "there is no evidence these

conditions could not come under control with proper treatment. Nor is there any evidence the

conditions are durational, i.e. lasting for twelve continuous months despite treatment." *Id.* at 417.

However, as argued by the Plaintiff, the ALJ fails to discuss the 2017 EMG study in combination

with the February 2013 findings and the Plaintiff's reported symptoms over the years.

Finally, Dr. Hagan gave an updated medical source statement in April 2018, identifying

the Plaintiff's "symptoms or signs" as arthritis and diabetes. *Id.* at 1281. Indicating that the

Plaintiff is right-handed, Dr. Hagan opined that for the right hand the Plaintiff can never reach,

finger, or push/pull and can occasionally handle and feel. *Id.* at 1282. For the left hand, she

opined that he can occasionally reach, feel, or push/pull and can frequently handle and finger. *Id*.

The ALJ found this opinion "not supported or consistent with the evidence," and gave it little

weight. *Id.* at 414. The ALJ explains that Dr. Hagan's opinion "seems inconsistent with her

statement the claimant can use, sort, and handle papers and files." *Id.* It is not facially apparent

why those functions are inconsistent. This appears to be the ALJ substituting his lay judgment

for Dr. Hagan's medical opinion. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The

ALJ also found Dr. Hagan's opinion to be inconsistent with Ms. Bennett's May 2016 findings regarding the Plaintiff's hands, which suggests the ALJ gave controlling weight to Ms. Bennett's opinion. AR 417. However, as described above, the ALJ does not appear to have taken into account limitations based on Ms. Bennett's findings.

In his decision, the ALJ acknowledges the February 2013 EMG findings but concludes that "the findings on physical examination by examining and treating sources as discussed . . . did not show disabling functional limitations." AR 415. Based on the evidence set forth above, this broad statement does not indicate that ALJ considered how the Plaintiff's hand impairments in combination with the limitation to unskilled, sedentary work would affect the disability determination. Thus, it is not clear how the ALJ accounted for the Plaintiff's hand impairments that are supported by the record. *See Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) ("A failure to fully consider the impact of non-severe impairments requires reversal." (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003))). An ALJ "must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski*, 245 F.3d at 887). An ALJ may not discuss "only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (citing *Moore*, 743 F.3d at 1124; *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)); *see also Hardy v. Berryhill*, 908 F.3d 309, 312 (7th Cir. 2018) ("An ALJ must grapple with lines of evidence that are contrary to [his] conclusion, and here the ALJ did not do so." (citing *Thomas*, 745 F.3d at 806)).

The failure to properly consider the Plaintiff's hand impairments is not harmless because "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral

manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or

pinch. Most unskilled sedentary jobs require good us of the hands and fingers for repetitive hand-

finger activities." SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996). The Plaintiff offers the

following hand and finger ability requirements of the three jobs identified by the vocational

expert, and the Commissioner offers no response. The job of "addresser" requires a worker to

have "wrist-finger" speed, which is the ability to make fast, simple, repeated movements of the

fingers, hands, and wrists. Addresser, DOT, https://occupationalinfo.org/20/209587010.html;

Typists, Including Word Processing, O*Net Online, https://occupationalinfo.org/onet/

55307.html. Next, the job of "final assembler" requires "manual dexterity" described as "[t]he

ability to quickly make coordinated movements of one hand, a hand together with its arm, or two

hands to grasp, manipulate, or assemble objects." Table Worker, DOT, https://occupationalinfo.

org/71/713687018.html; Assemblers and Fabricators–Except Machine, Electrical, Electronic,

and Precision, O*Net Online, https://occupationalinfo.org/onet/93956.html. Finally, a "table

worker" must be able to "quickly and repeatedly make precise adjustments in moving the

controls of a machine or vehicle to exact positions" in addition to the manual dexterity and wrist-

finger speed described above. Table Worker, DOT, https://occupationalinfo.org/73/

739687182.html; Production Inspectors, Testers, Graders, Sorters, Samplers, Weighers, O*Net

Online, https://occupationalinfo.org/onet/83005a.html.

Because it is not clear that the Plaintiff could have performed the jobs identified by the

vocational expert if hand limitations had been included in the RFC, the failure to properly

discuss the hand limitations is not harmless. *See Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th

Cir. 2013) ("But this kind of error is subject to harmless-error review, and we will not remand a

case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."). Thus, remand is required on this issue.

2.      *Right Foot Impairment and Use of a Cane*

Regarding the Plaintiff's right foot impairment, the medical records document right foot drop; a May 2017 EMG showing "severe and generalized peripheral polyneuropathy . . . consistent with the patient's history of diabetes mellitus" and "evidence of a right L5 radiculopathy with ongoing denervation responsible for patient's right foot drop"; decreased sensation in the lower extremities; difficulty with or inability to walk on heels, toes, tandem walk, squat, and do straight leg raises; less than normal range of motion; healed Charcot changes bilaterally with slight rocker-bottom and abduction deformity; and a prescription from the orthopedic surgeon for a right articulated ankle-foot orthoses (AFO). *See, e.g.*, AR 981, 1048, 1089, 1113, 1115, 1116, 1166, 1301. Numerous medical providers document that the Plaintiff used a cane for walking and balancing beginning in December 2013 through May 2018, including treating physician Dr. Hagan, Ms. Bennett, consultative examiner Dr. Greer, neurologist Dr. Curfman, pain specialist Dr. Posner, an occupational therapist, and a physical therapist. *See, e.g., id.* at 332, 341–42, 907, 943, 992, 1048–50, 1100, 1101, 1104, 1106–08, 1110, 1119, 1122, 1128, 1154, 1287, 1290, 1293, 1295, 1299. Dr. Hagan appears to have prescribed a cane. *See id.* at 935, 1178. Dr. Hagan (in 2014 and 2018) and Ms. Bennett (in 2016) opined that the Plaintiff requires a cane for ambulation, and consultative examiner Dr. Greer (in 2016) opined that the Plaintiff can walk ten feet without a cane. *Id*. at 313–18, 988, 1048, 1282.

Based on this record, the Plaintiff argues that the ALJ erred by finding that the evidence was not "persuasive that the claimant requires a cane to walk on an occasional basis" and by omitting a cane requirement from the RFC. *Id.* at 413. Initially, it appears the issue is easily

resolved because the vocational expert testified that, even if the Plaintiff needed to hold a cane in his right hand to maintain balance, the Plaintiff would still be able to perform the three jobs the vocational expert had identified. AR 408, 413, 483. Thus, any error regarding the cane would be harmless. However, as set forth in the next section, the Commissioner has not met her burden at step five of showing that those three jobs constitute a significant number of jobs in the economy that the Plaintiff can perform. As a result, any failure to properly consider the Plaintiff's use of a cane may not be harmless. On remand, the following issues raised by the Plaintiff regarding the cane and the weight of opinion evidence should be addressed if the ALJ again finds that the Plaintiff does not require a cane to walk on an occasional basis.

In relying on consultative examiner Dr. Onamusi's March 2013 statement that the Plaintiff does not require an assistive device to ambulate or transfer, the ALJ should consider Dr. Onamusi's examination findings and should also consider that 2013 opinion in relation to the progression of the Plaintiff's neuropathy and increased difficulties ambulating over the years.

The ALJ relies on the December 2016 follow-up x-ray ordered by orthopedic surgeon Dr. Karr showing evidence of "healed" midfoot Charcot changes bilaterally with slight rocker-bottom and abduction deformities, *see id.* at 412 (citing *id.* at 1117), without discussing the November 2016 x-ray of both feet/ankles that showed Charcot changes of the midfoot in both feet, worse in the right foot, and diagnoses of right foot drop, right foot Charcot joint disorder, and left foot Charcot joint disorder, *see id.* at 1113. The ALJ does not explain why the findings of "slight rocker-bottom and abduction deformities" in the December 2016 x-ray are inconsistent with the Plaintiff's complaints or the need for a cane. The Court recognizes the ALJ's reliance on the fact that, in December 2016, Dr. Karr prescribed a right articulated AFO but did not recommend a cane. *Id*. at 412 (citing *id.* at 115). While this observation is correct, in light of the

body of evidence, the ALJ should also note that Dr. Karr did not offer *any* opinion about a cane or indicate that a cane was not medically necessary.

The ALJ notes that "an EMG confirmed severe peripheral polyneuropathy" but then concludes that treatment records from various doctors did not "show a disabling level of neuropathy." *Id.* at 412. But the ALJ offers no explanation or evidence as to what he would expect to be disabling or what alternate treatment the Plaintiff should have explored.

The ALJ appears to contrast the physical examination findings of Dr. Bennett and Dr. Posner's nurse Ms. Lanning to suggest that the Plaintiff's leg and foot issues do not require a cane. *See id.* at 411. However, Ms. Lanning also noted throughout the treatment records that the Plaintiff used a cane in relation to his gate. *See, e.g.*, *id.* at 974.

In discounting Dr. Hagan's opinion that the Plaintiff requires a cane, the ALJ characterizes Dr. Hagan's treatment plan as "conservative" but does not discuss what other treatments were available or identify any evidence that the Plaintiff did not follow the treatment, which included occupational therapy, physical therapy, pain management, the EMG study in 2017, and consultation with a podiatrist and an orthopedic surgeon. *See id.* at 413. These factors should be considered in weighing Dr. Hagan's opinion under the treating physician rule. *See Beardsley*, 758 F.3d at 840. In addition, the ALJ should consider Dr. Hagan's opinion in relation to the longitudinal record of cane use. And, if the ALJ again finds that Dr. Hagan's treatment relationship ended in April 2017, the ALJ should consider that Dr. Hagan prescribed medications in July and October 2017 and May 2018. *See* AR 886–87.

Finally, the ALJ contrasts Dr. Karr's exam findings with those of Dr. Greer, stating that Dr. Karr's physical examination "showed the claimant to have a normal gait and steppage." *Id.* at 412 (citing *id.* at 1116). However, "steppage" refers to a "gait in which the foot is lifted high to

15

clear the toes, there is no heel strike, and the toes hit the ground first." Steppage gait, Taber's Medical Dictionary, https://www.tabers.com/tabersonline/view/Tabers-Dictionary/762890/all/gait?q=gait+steppage#26. Given the repeated findings of other practitioners regarding the Plaintiff's gait, it is unclear that Dr. Karr's physical examination findings are contrary to those of Dr. Greer's.

The Court acknowledges that, overall, the ALJ thoroughly discussed the records related to the Plaintiff's use of a cane. However, that thoroughness does not obviate the need to address these issues in creating a logical bridge between the evidence and the RFC.

**B.      Step 5 Determination—Significant Number of Jobs in the National Economy**

A claimant is deemed not disabled if there is a "significant number of jobs that the applicant for benefits can perform anywhere in the United States." *Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) (citing *Browning v. Colvin*, 766 F.3d 702, 708 (7th Cir. 2014)). The burden is on the Commissioner at step five. *Zurawski*, 245 F.3d at 886.

The Plaintiff argues that the ALJ erred by failing to identify a significant number of jobs in the economy that he can perform. The ALJ found that the Plaintiff could perform the jobs of addresser (over 25,000 jobs nationally), final assembler (50,000 jobs nationally), and table worker (24,000 jobs nationally) based on the vocation expert's testimony. AR 422–23. The Plaintiff contends that jobs of "addresser" and "final assembler" should not be considered because the positions are obsolete. *See Alaura*, 797 F.3d at 507; *Yanke v. Kijakazi*, No. 20-CV-1055, 2021 WL 4441188, at *4 (E.D. Wis. Sept. 28, 2021) (citing cases). The Commissioner offers no law or argument in support of either position. If those two positions are eliminated, only 24,000 "table worker" jobs in the national economy remain. Citing persuasive authority, the Plaintiff argues that 24,000 positions in the national economy is not significant. Offering no legal

response, the Commissioner simply "disagrees" that 24,000 jobs in the national economy is not a significant number.

In *Weatherbee v. Astrue*, the Seventh Circuit found that the availability of 140,000 jobs nationally was "well above the threshold for significance" but did not identify the threshold. 649 F.3d 565, 572 (7th Cir. 2011). District courts in this circuit have come to different conclusions as to how many jobs in the national economy is a significant number, but several have found that a number of jobs close to 24,000 was not a significant number in the national economy. *Compare John C. v. Saul*, 4:19-CV-4111, 2021 WL 794780, at *5–6 (C.D. Ill. Mar. 2, 2021) (finding that the Commissioner had not met his burden to show that 20,000 jobs nationally is a significant number); *Douglas G. v. Kijakazi*, No. 19-CV-7033, 2021 WL 3849637, at *4–5 (N.D. Ill. Aug. 27, 2021) (finding that, where two of the three jobs identified by the vocational expert were eliminated leaving only one position with 27,000 jobs nationally, the court could not determine on its own whether substantial evidence supported the step five finding because the vocational expert's testimony that jobs existed in significant numbers was based on all three positions); *Ellis v. Kijakazi*, No. 20-CV-719, 2021 WL 3514701, at *5–6, —F. Supp. 3d —, — (E.D. Wis. Aug. 9, 2021) (finding that the Commissioner did not meet the burden of showing that 14,500 jobs in the national economy is significant); *James A. v. Saul*, 471 F. Supp. 3d 856, 860 (N.D. Ind. 2020) (finding that "14,500 is far below any national number of jobs that the Seventh Circuit Court of Appeals has determined to be significant"); *Sally S. v. Berryhill*, No. 2:18-CV-460, 2019 WL 3335033, at *11 (N.D. Ind. July 23, 2019) (finding 120,350 jobs nationally not a significant number); *with Engel v. Kijakazi*, No. 20-CV-1206, 2021 WL 4843871, at *12 (E.D. Wis. Oct. 18, 2021) (finding 23,000 jobs nationally is not an *in*significant number); *Angela L. v. Saul*, No. 1:20-CV-481, 2021 WL 2843207, at *5–6 (S.D. Ind. July 7, 2021) (finding 53,200 national jobs

a significant number); *Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at \*17 (N.D. Ill.

Dec. 19, 2019) (finding 40,000 jobs nationally a significant number); *Dorothy B. v. Berryhill*,

No. 18 CV 50017, 2019 WL 2325998, at \*7 (N.D. Ill. May 31, 2019) (finding 17,700 jobs in the

national economy a significant number); *Iversen v. Berryhill*, No. 16 CV 7337, 2017 WL

1848478, at \*5 (N.D. Ill. May 8, 2017) (finding 30,000 jobs nationally a significant number).

Based on the record and argument in this case, the Court finds that the Commissioner has

not met its burden at step five. On remand, the ALJ will have an opportunity to reconsider

whether a significant number of jobs exist in the national economy for the Plaintiff.

## C.     Weight to Opinion Evidence

The Plaintiff argues that the ALJ erred in giving little to no weight to the opinion of Dr.

Hagan, his longtime treating physician, by failing to consider her opinions under the regulations

and by selectively highlighting treatment records to minimize the Plaintiff's health problems.

The treating physician rule,[2] which provides that the opinion of a treating physician on

the nature and severity of an impairment is given controlling weight if it "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Jelinek*

*v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). If an ALJ does not give the treating physician's

opinion controlling weight, the ALJ must apply the factors set forth in the regulations to

determine what other weight to give the opinion. 20 C.F.R. § 404.1527(c)(2); *see also Yurt v.*

*Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). The factors are whether there is an examining

relationship; whether there is a treatment relationship, and if so, the length of the relationship, the

---

[2] On January 18, 2017, the Commissioner published new regulations, "Revisions to Rules Regarding the Evaluation of Medical Evidence," which addressed 20 C.F.R. § 404.1527. However, the new regulations only apply to claims filed on or after March 27, 2017.

frequency of examination, and the nature and extent of the relationship; whether the opinion is supported by relevant evidence and by explanations from the source; the consistency of the opinion with the record as a whole; whether the opinion was offered by a specialist about a medical issue related to the area of specialty; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)–(6). "An ALJ must offer good reasons for discounting the opinion of a treating physician." *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016) (citing *Moore*, 743 F.3d at 1127). F

Contrary to the Plaintiff's argument, the ALJ followed the general requirements of the treating physician rule and explicitly considered the treatment relationship, its length and nature, and the consistency of Dr. Hagan's opinions with the other evidence and opinions of record. *See* AR 411, 413, 413, 317, 318, 419, 420. Nevertheless, as referenced in the previous sections, the ALJ's weighing of Dr. Hagan's opinion specifically as to the Plaintiff's hand limitations and need for a cane requires further explanation on remand.

**D.    Subjective Symptoms**

Finally, the Plaintiff argues that the ALJ failed to properly consider his subjective symptoms under SSR 16-3p. On remand, the ALJ will have an opportunity to specifically identify the Plaintiff's statements related to his hand impairments and need for a cane and explain why they are inconsistent with the record. For example, the ALJ discredits the Plaintiff's statement that he does not drive long distances by noting that the Plaintiff had driven to the hearing, but it appears that the ALJ did not explore why the Plaintiff had driven to the hearing or how often he drives that distance. In contrast, in the May 2016 functional capacity examination, Ms. Bennett noted that the Plaintiff reported that he limits his driving to short distances and that he did not drive himself to the evaluation. AR 993.

**E.      Award of Benefits**

The Plaintiff asks the Court to reverse and remand for an award of benefits or, in the

alternative, for further proceedings. "An award of benefits is appropriate . . . only if all factual

issues involved in the entitlement determination have been resolved and the resulting record

supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v.*

*Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d

345, 355 (7th Cir. 2005)). Based on the discussion above, an immediate award of benefits is not

appropriate.

<b>CONCLUSION</b>

For the reasons set forth above, the Court GRANTS the relief sought in the Plaintiff's

Brief [ECF No. 16], REVERSES the final decision of the Commissioner of the Social Security

Administration, and REMANDS this matter for further proceedings consistent with this Opinion.

The Court DENIES the Plaintiff's request for an award of benefits.

SO ORDERED on November 22, 2021.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT